Cite as 2025 Ark. App. 41

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-24-41

| | |
|---|---|
| KENNETH JOHNSON | **Opinion Delivered** January 29, 2025 |
| APPELLANT | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION |
| V. | [NO. G506453] |
| LAND O'FROST, INC.; AND PAIN MANAGEMENT CORPORATION | |
| APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Judge

Kenneth Johnson appeals the decision of the Arkansas Workers' Compensation Commission (the Commission) that affirmed and adopted the opinion of the administrative law judge (ALJ), who found that Johnson had not proved that he sustained compensable work-related injuries to his back and head on 21 August 2015, nor had he proved entitlement to permanent partial-disability benefits in regard to his back injury, permanent and total disability, or wage-loss disability. Johnson contends that the Commission's decision is not supported by substantial evidence. We affirm.

Johnson was employed by Land O' Frost as a truck driver and sustained admittedly compensable injuries to his right hip and neck on 21 August 2015 when he "fell approximately 20 or 25 feet from the 'bubble of the truck' attempting to remove the antenna from the truck." Johnson was seen by Dr. J.P. Wornock that day and received stitches for a laceration to his right ear. He also complained of moderate to severe hip pain and elbow pain. At the time of his injuries, Johnson was sixty-seven years old.

The next day, Dr. Wornock noted that Johnson's ear was healing well, and other than some bruising, Johnson "denied any further problems nor complications." On August 25, Johnson reported numbness in his right hip and dizziness for the first time. On August 28, he reported headaches, memory loss, and dizziness. Dr. Wornock assessed a "mental status change" and ordered a CT scan of his head. The CT scan showed normal attenuation with no focal mass lesion and no evidence of skull fracture or intracranial hemorrhage. On September 1, Dr. Wornock found that Johnson's laceration had healed, he had no bruising or swelling on the side of his head, and he had "no other complaints or concerns at this time." Dr. Wornock noted that Johnson's "mental status change" was "now resolved," and he was released to drive.

On November 20, Johnson presented with visual changes in his right eye, low back pain, leg numbness, and loss of balance when he closed his eyes in the shower. Dr. Wornock diagnosed bilateral low back pain without sciatica, neck pain, and a swollen eyelid, and he referred Johnson to physical therapy.

On 8 January 2016, Johnson reported still having pain on the left side at the base of his neck as well as mild back pain and headaches. Dr. Wornock referred him to Dr. Brent Sprinkle for evaluation, specifically on the issue of whether Johnson could return to driving a semi ten hours at a time. If Dr. Sprinkle cleared him to drive, he was to undergo cognitive testing with Dr. Serena McKnight. Dr. Wornock noted that if Johnson did well on cognitive testing, he could return to driving, but if he did poorly "then he will not be cleared to drive and it will need to be determined if his cognition was on the decline prior to the incident (given a normal CT head at the time of accident) then it would not be w/c

2

related." The record does not indicate whether Johnson was ever evaluated by Dr. Sprinkle or Dr. McKnight.

On 26 January 2016, Dr. Wornock noted that Johnson was still reporting neck pain as well as some disorientation and that Johnson would be referred to a spine and neck specialist "for evaluation of his chronic pain (since the accident)." One week later, Johnson showed no improvement, and Dr. Wornock noted that Johnson's range of motion in his neck was limited in all directions "but mostly limited on chin moving to the left shoulder."

Johnson visited Dr. Justin Seale at Arkansas Specialty Orthopaedics on 7 March 2016 and reported neck pain radiating to his left shoulder and low back pain radiating into his legs. Dr. Seale's examination revealed limited range of motion (ROM) in Johnson's cervical spine but "full ROM without pain, tenderness, signs of instability or muscle spasms" in his lumbar spine. Johnson's x-rays showed "moderate disc space narrowing" and "segment kyphosis" in his cervical spine and "severe disc space collapse of bone spurring" in his lumbar spine. Dr. Seale diagnosed C5-6 degenerative disc disease with left-sided neck pain to the shoulder and severe degenerative disc disease back pain and bilateral leg pain. Dr. Seale opined that it was safe for Johnson to resume work as a commercial driver. Johnson returned to Dr. Seale in May 2016 and was declared at maximum medical improvement (MMI) with a zero percent impairment rating "because no objective findings of injury. Findings are pre-existing."

Johnson again returned to Dr. Seale in February 2017 and reported neck pain and low back pain with radiating pain in his left shoulder, left arm, and left buttock and leg. An x-ray revealed no significant changes to Johnson's cervical or lumbar spine since the year

before. Dr. Seale recommended physical therapy and restricted Johnson from commercial driving. A follow-up report in April 2017 noted, "Physical therapy is slowly helping but he continues to have the main complaint of neck pain and left-sided intrascapular pain that prevents him from moving his neck to the left." In June 2017, Dr. Seale noted that Johnson had an injury in 2015 but "we have yet to MRI his cervical or lumbar spine. My recommendation is an MRI of the cervical lumbar spine and follow-up afterwards. We will most likely consider a C5-6 ESI [epidural steroid injection] if imaging is appropriate. Currently his neck is bothering more than the back."

Johnson received an ESI on 31 July 2017 and followed up with Dr. Seale in October 2017. Dr. Seale noted that because Johnson has had minimal improvement after physical therapy and the ESI, it was "very reasonable to consider surgical decompression and fusion of the cervical spine." Dr. Seale also remarked,

> The patient's symptoms began on and after the work injury. The patient has no history of pain in the low back or down the leg prior to the work injury. Therefore it is within a certain degree of medical certainty that at least 51% of the patient's current symptoms and need for surgery are directly related to their work injury.

Dr. Seale performed an anterior cervical fusion at the C5, C6, and C7 levels on 12 December 2017.

In February 2018, Dr. Seale recommended physical therapy for core strengthening and stretching. A therapy progress note dated 31 May 2018 noted that Johnson "reports LB [lower back] feeling stronger and having decrease[d] pain in LB." Another progress note from 5 June 2018 noted that Johnson "reports having decrease[d] pain overall at end of day in neck and LB."

4

On 2 July 2018, Dr. Seale opined that Johnson had reached MMI and could return to work without restrictions. Dr. Seale assigned an 11 percent impairment rating based on a single level cervical fusion with decompression with residual pain being 10 percent and an additional 1 percent for the second level.

Johnson returned to work full time and drove approximately 55,036 miles in 2018 and 77,975 miles in 2019. After experiencing some memory lapses at work, however, Johnson's primary care provider, APRN Sara Wilcox, referred him for a neurocognitive evaluation with Dr. Dan Johson in March 2020.

Johnson relayed his medical history to Dr. Johnson and described current symptoms of daily headaches, decreased range of motion in his cervical region, balance issues, and tinnitus. Dr. Johnson noted that when asked, "neither the patient nor his wife who accompanied him to the appointment described any significant residual cognitive changes resulting from the fall." Dr. Johnson concluded that Johnson's short-term memory was severely impaired, and he "appear[ed] to meet criteria for mild cognitive decline/initial stage dementia at this time." Dr. Johnson opined that Johnson "should be considered 100% disabled at this time with no return to work recommended." Johnson returned to Wilcox on 30 June 2020 and identified his chief complaint as "needs short term disability paperwork filled out." He was also referred to a psychiatrist to treat his memory loss.

In May 2021, Johnson visited Dr. Barry Baskin for an independent medical evaluation requested by Land O' Frost's insurance provider. After reviewing the available medical records[1] and conducting a physical examination of Johnson, Dr. Baskin opined,

> It is much easier to diagnose a traumatic brain injury when the evaluation is done on the front end in the acute phase of the injury as opposed to being done almost 6 years down the road. Mr. Johnson's neck injury appears to have been clearly related to his work injury. It does not mean that he did not have some pre-existing degenerative changes, but as Dr. Seale noted, he was asymptomatic and working every day and did not complain of inability to look over his left shoulder or to be able to move his neck freely until his work injury.
>
> . . . .
>
> The difficulty of relating Mr. Johnson's cognitive decline to his injury, again, is more difficult due to the interval time delay since his fall. Dr. Johnson's evaluation shows clear significant cognitive deficits, as he states, highlighted by severe short-term memory deficits at both acquisition and recall retention levels. It was also noted that he has visuospatial construction and basic visuomotor deficits, slow processing speed, and visuomotor capacity all well below the 5th percentile. It is certainly possible that Mr. Johnson did sustain a traumatic brain injury with his fall and closed head injury. MRI is much better than CT at looking for traumatic brain injury[.] . . . Based on the records from Dr. Wornock's office who was following the patient acutely, Mr. Johnson appeared to manifest memory deficits almost immediately after his injury. His return to work was delayed and when he did return to work he did not have success and ultimately was let go from his position. If he is manifesting ongoing cognitive deficits, it is possible that he is having some dementia.

In June 2021, Dr. Baskin supplemented his report to include his recommendations for future medical treatment. He recommended that Johnson undergo a noncontrasted MRI brain scan, additional physical therapy, and speech therapy.

Johnson's MRI, performed on 20 July 2021, revealed

---

[1]Other than the neurocognitive evaluation report dated 12 March 2020, Dr. Baskin did not receive any medical records dated after 5 June 2018.

scattered microvascular white matter changes throughout both cerebral hemispheres. The brain parenchyma is otherwise normal. There is no midline shift or mass-effect. The ventricles and basal cisterns are normal. The pituitary and corpus callosum are normal. The cerebellum and cerebellopontine angles are normal. There is opacification of the left maxillary sinus. There is mucoperiosteal thickening in the ethmoid air cells. The orbits and globes are normal. There is no restricted diffusion.

Final impressions were "mild microvascular white matter changes" and "left maxillary and ethmoid sinusitis."

Dr. Baskin reevaluated Johnson on 4 January 2022 and reviewed the MRI results. Dr. Baskin opined that the "microvascular changes are consistent with age for the most part." He also noted, "Mr. Johnson and his wife state that he did not have severe memory problems after his fall and that he was able to resume work. His wife has reported one time that he had some fairly acute memory changes after his work related fall." Dr. Baskin concluded that he did not see "clear-cut findings that suggest he has had a traumatic brain injury or significant cognitive loss as a result of his fall." Dr. Baskin could not say "with reasonable medical certainty that his memory decline is related to his work injury or the result of his age and his diffuse microvascular small vessel ischemic changes on his MRI scan."

The ALJ convened a hearing on 9 May 2023, and after reviewing all the medical records submitted and other documents as well as receiving testimony from Johnson, his wife, and Teddy Townsend, an environmental health and safety manager at Land O' Frost, issued an opinion on 20 June 2023. The ALJ found,

> In regard to the claimed back injury, the medical records clearly provide that the claimant suffered from severe degenerative disc disease at L5–S1. Dr. Wornock, the claimant's initial treating physician[,] never opined that the claimant's back problems were work-related. Dr. Seale, who could be

7

considered the primary treating physician, opined that the neck or cervical problems were at least fifty-one (51%) related to the work injury, but never made such a finding in regard to the remainder of the back even after treating the claimant for an extended period of time and performing surgery on the claimant's neck. The claimant returned to the same job for two (2) years. Based upon the available evidence in the case at bar, there is no alternative but to find that the claimant has failed to satisfy the burden of proof to show that his back claim is compensable under the Arkansas Workers' Compensation Act and that consequently, the question of medical and permanent partial disability as well as attorney fees in regard to the back are moot.

In regard to the claim of a head injury, the claimant was born on July 11, 1948, and both Dr. Johnson and Dr. Baskin made no finding in regard to the claimant's memory issues being related to the work injury of August 21, 2015. For that matter, no treating physician opined that the memory issue was related to the work injury. The claimant was injured on August 21[,] 2015, and both Dr. Baskin and Dr. Johnson inferred that it would be difficult to make a finding of a connection between the memory issue and the accident due to the passage of time of approximately six (6) years, the lack of an MRI of the brain, and the claimant's age. Consequently, there is no alternative but to find that the claimant has failed to satisfy the required burden of proof that his head injury is compensable under the Arkansas Workers' Compensation Act, and that consequently all other issues relating to the head injury are moot.

As to permanent total disability, the ALJ concluded, "Any such finding of permanent total disability would be based upon speculation." The ALJ also reiterated that there were multiple factors that could have caused memory loss and that no physician opined that the cause was Johnson's compensable injury six years ago. Consequently, the ALJ found, "there is no alternative but to find that the claimant's proof has failed to show that the compensable injury was in fact the cause of the memory loss and consequently the claimant has failed to satisfy that he is entitled to wage-loss."

Johnson appealed to the Commission, which affirmed and adopted the ALJ's opinion as its own with one commissioner dissenting. This appeal followed. Under Arkansas law, the Commission is permitted to adopt the ALJ's opinion. *SSI, Inc. v. Cates*, 2009 Ark. App.

8

763, 350 S.W.3d 421. In so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *Id.* Therefore, for purposes of our review, we consider both the ALJ's opinion and the Commission's majority opinion. *Id.*

We review the Commission's decision in the light most favorable to its findings and affirm when the decision is supported by substantial evidence. *Parker v. Atl. Rsch. Corp.*, 87 Ark. App. 145, 189 S.W.3d 449 (2004). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* The issue is not whether the appellate court might have reached a different result from the Commission but whether reasonable minds could reach the result found by the Commission: if so, the appellate court must affirm. *Parker v. Comcast Cable Corp.*, 100 Ark. App. 400, 269 S.W.3d 391 (2007). It is the Commission's duty to make determinations of credibility, to weigh the evidence, and to resolve conflicts in medical testimony and evidence. *Martin Charcoal, Inc. v. Britt*, 102 Ark. App. 252, 284 S.W.3d 91 (2008). The Commission is not required to believe the testimony of the claimant or any other witness but may accept and translate into findings of fact only those portions of the testimony it deems worthy of belief. *Farmers Coop. v. Biles*, 77 Ark. App. 1, 69 S.W.3d 899 (2002).

## I. *Back Injury*

Johnson argues that there is no evidence he had any symptoms in his back before his fall at work. He cites Dr. Seale's statement that Johnson's symptoms "began on and after the work injury. The patient has no history of pain in the low back or down the leg prior to the work injury. Therefore it is within a certain degree of medical certainty that at least

9

51% of the patient's current symptoms and need for surgery are directly related to their work injury." Johnson asserts that the lack of any evidence of back pain before his fall, coupled with consistent complaints of back pain after his fall, leads to the "logical conclusion" that he sustained a "compensable aggravation of his pre-existing degenerative condition in his back as a result of his fall." He also insists that Dr. Seale was referring to both his neck injury and his back injury when he opined that "51% of the patient's current symptoms and need for surgery are directly related to their work injury." He contends that the Commission erred in holding that Dr. Seale's statement referred only to his neck injury and asks this court to reverse the Commission's finding as to compensability and remand for additional findings, including his entitlement to permanent partial disability for his back injury.

Land O' Frost first explains that an injury for which a claimant seeks benefits must be established by medical evidence supported by objective findings, which are findings that cannot come under the voluntary control of the patient. *Carter v. GEA N. Am., Inc.*, 2023 Ark. App. 134, 662 S.W.3d 685; Ark. Code Ann. § 11-9-102(4)(D) & (16) (Supp. 2023). Here, it contends, Johnson failed to prove the existence of such findings and thus failed to establish a compensable back injury. Land O' Frost asserts that Johnson did not complain of back pain until 20 November 2015, three months after his fall at work, and the records from that visit contain no objective findings of a lower back injury. Nor are there any objective findings of a back injury, such as muscle spasms, in any of Johnson's physical-therapy notes. Finally, none of his physicians noted any muscle spasms or other objective findings of a back injury; in fact, Dr. Seale noted on Johnson's initial visit that he had "full

10

ROM without pain, tenderness, signs of instability or muscle spasms" in his lumbar spine. An x-ray of his lumbar spine revealed degenerative disc disease but no signs of an acute injury.

We first note that Johnson did not claim below that his back injury was an aggravation to a preexisting injury, and we will not consider issues that are raised for the first time on appeal. *Smith v. Com. Metals, Co.*, 2011 Ark. App. 218, 382 S.W.3d 764.

Second, other than his lack of complaints before the fall and his complaints of back pain after the fall, Johnson primarily relies on Dr. Seale's statement that "51% of the patient's current symptoms and need for surgery are directly related to their work injury." Johnson claims Dr. Seale is referring to both his neck and back, but the Commission found that Dr. Seale was referring to Johnson's neck or cervical problems and not his back. As noted above, it is the Commission's duty to make determinations of credibility, to weigh the evidence, and to resolve conflicts in medical testimony and evidence. *Martin Charcoal*, *supra.* We conclude that reasonable minds could interpret Dr. Seale's statement as the Commission did, and we affirm the Commission's decision that Johnson did not establish a compensable injury to his back.

II. *Head Injury*

On this point, Johnson explains that he was treated for a head injury and complained of headaches at the time of the fall and continuing afterward. He also notes that he had not been treated for headaches or memory issues before his fall. He contends that the Commission erred in its interpretation of, and reliance on, the opinions of Dr. Baskin and Dr. Johnson regarding the correlation between his work injury and his memory issues. Dr.

11

Johnson actually opined that Johnson's "neurocognitive deficits cannot be accounted for by normal aging," and Dr. Baskin erroneously noted in his initial report that Dr. Johnson did not think Johnson's cognitive issues were related to his work injury. Johnson also points out inconsistencies in Dr. Baskin's reports: at one point, Dr. Baskin reports, "The patient and his wife today both state that the patient began noticing cognitive decline and memory deficits almost immediately after the injury"; however, in a later report he states, "Mr. Johnson and his wife state that he did not have severe memory problems after his fall." Johnson concludes that the Commission erred by ignoring objective findings of a head injury, misconstruing the opinion of Dr. Johnson, and giving weight to Dr. Baskin's conclusory statement that he could not state that Johnson's cognitive decline was caused by the fall.

Land O' Frost responds that the record contains substantial evidence to support the Commission's opinion regarding Johnson's failure to prove a compensable head injury. Just like the back-injury claim, the record contains no evidence of any objective findings that would support his claim of a head injury. While Johnson undoubtedly sustained a laceration to his right ear, a CT scan of Johnson's head performed on 28 August 2015, one week after his fall at work, showed "normal attenuation with no focal mass lesion and no evidence of skull fracture or intracranial hemorrhage." At a follow-up visit a few days later, Dr. Wornock found that Johnson's laceration had healed, he had no bruising or swelling on the side of his head, any "mental status change" had resolved, and he had "no other complaints or concerns at this time."

12

Johnson eventually returned to work with no restrictions both before and after his neck surgery, and after his surgery, he worked as a commercial driver for approximately two years before he began to experience memory lapses. He was placed on leave and referred to Dr. Johnson for a neuropsych consult, which occurred on 3 March 2020, approximately four and a half years after his fall at work. Dr. Johnson's report indicated that "neither the patient nor his wife who accompanied him to the appointment described any significant residual cognitive changes resulting from the fall." Dr. Johnson ultimately diagnosed "mild cognitive decline/initial stage dementia," but he made no determination or finding that the work injury contributed to this condition.

In addition, Dr. Baskin noted in his first evaluation of Johnson that it would be difficult to relate his cognitive decline to his injury given the time delay since his fall. Johnson underwent a brain MRI, which showed only "mild microvascular white matter changes" and "left maxillary and ethmoid sinusitis." Dr. Baskin's evaluation after the MRI concluded that the microvascular changes are consistent with age and that he did not see "clear-cut findings that suggest [Johnson] has had a traumatic brain injury or significant cognitive loss as a result of his fall." Dr. Baskin could not say "with reasonable medical certainty that his memory decline is related to his work injury or the result of his age and his diffuse microvascular small vessel ischemic changes on his MRI scan." Land O' Frost concludes that the evidence in the record is more than sufficient to affirm the Commission's opinion on this point.

We hold that reasonable minds could reach the result found by the Commission. Johnson is essentially asking this court to reweigh the evidence, but again, it is the

Commission's duty to make determinations of credibility, to weigh the evidence, and to resolve conflicts in medical testimony and evidence. *Martin Charcoal*, *supra*.

### III. *Permanent Total Disability and Wage Loss*

The issue of permanent and total disability or, in the alternative, wage loss, means the inability, because of a compensable injury or occupational disease, to earn any meaningful wages in the same or other employment. Ark. Code Ann. § 11-9-519(e)(1) (Repl. 2012). The burden of proving the inability to earn any meaningful wages is on the injured worker. Ark. Code Ann. § 11-9-519(e)(2). Permanent benefits may be awarded only if the compensable injury was the major cause of the disability or impairment. Ark. Code Ann. § 11-9-102(4)(F)(ii)(a).

Johnson argues that he is 100 percent disabled due to his neurocognitive deficits according to Dr. Johnson. In addition, Johnson's primary work experience has been as a commercial driver, and since his fall at work, he has had difficulty walking and turning his head or neck to the left. He contends that if he cannot turn to see his mirrors or otherwise see what is going on around him, his ability to perform as a driver is severely impaired, if not lost completely. At this point, he says, he is unable to perform any gainful employment.

Land O' Frost answers that after his work injury, Johnson returned to work as a commercial driver on two separate occasions (before and after his neck surgery), and during that time, he passed two physicals needed to qualify for his commercial license. Thus, Johnson's claim for permanent total disability or wage loss is unrelated to the work injury "since claimant was able to earn the same or similar wages performing the same job after the work injury." Land O' Frost also asserts that because there is no evidence of a

14

compensable head injury, Johnson cannot prove that his work injury is the major cause of his subsequent dementia. Finally, because substantial evidence supports the denial of his back- and head-injury claims, his claims for permanent and total disability and wage-loss disability are moot.

We agree that because we have affirmed the Commission's decision that Johnson did not prove a compensable injury to his back or his head, he necessarily is not entitled to any disability benefits related to those alleged injuries.

Affirmed.

KLAPPENBACH, C.J., agrees.

VIRDEN, J., concurs.

**BART F. VIRDEN, Judge, concurring**. I write separately to say that the current state of workers'-compensation law in Arkansas leaves us with no other choice but to affirm the Commission's decision.

Objective evidence of a traumatic brain injury, or closed-head injury (TBI), is often impossible to obtain because "the absence of CT abnormalities does not exclude structural damage—an observation relevant to litigation procedures, to management of mild TBI, and when CT scans are insufficient to explain the severity of the clinical condition." Andrew I. R. Maas et al., *Traumatic Brain Injury: Progress and Challenges in Prevention, Clinical Care, and Research,* 21 The Lancet Neurology, 1004, 1004 (Nov. 2022). In *Parson v. Arkansas Methodist Hospital*, 103 Ark. App. 178, 183–84, 287 S.W.3d 645, 649 (2008), we acknowledged this difficulty, noting that

> we recognize appellant's dilemma in attempting to prove objectively a condition that is undetectable with objective tests. However, Ark. Code Ann. § 11-9-102(4)(D)

15

requires that a compensable injury be established by medical evidence supported by objective findings, and we see no way for this dilemma to be addressed other than by legislative action.

The objective-findings requirement in Ark. Code Ann. § 11-9-102(4)(D) leaves the injured worker without recompense for devastating, life-changing injuries affecting his or her family and friends, ability to work, enjoyment of life, and general physical health and comfort. For the rest of his or her life, the injured worker must financially navigate the consequences of a work-related injury without help from the compensation system ostensibly designed to do just that. The objective-findings requirement in this area of workers'-compensation law ignores reality, medical technology, and common sense. Quite simply, our legal system has not kept pace with the medical system. Consider this concurrence a call for legislative action to protect and compensate workers who were grievously injured in the course of work.

*Caldwell Law Firm, P.A.*, by: *Andy L. Caldwell*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *Guy Wade* and *Johanna B. Wade*, for appellees.